UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

VALERIE LEA DAVENPORT

                          Plaintiff,          12-CV-6238

                                              **DECISION**
                    v.                        **and ORDER**

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY[1]

                          Defendant.
_____

## INTRODUCTION

      Represented by counsel, Valerie Lea Davenport ("Plaintiff" or
"Davenport"), brings this action pursuant to Titles II and XVI of
the Social Security Act ("the Act"), seeking review of the final
decision of the Commissioner of Social Security ("the
Commissioner") denying her application for Disability Insurance
("DIB") and Supplemental Security Income ("SSI") Benefits.  The
Court has jurisdiction over this action pursuant to 42 U.S.C.
405(g).

      Presently before the Court are the parties' competing motions
for judgment on the pleadings pursuant to Rule 12(c) of the Federal
Rules of Civil Procedure.  For the reasons set forth below, this
Court finds that the decision of the Commissioner is supported by

_____

      [1] This action was filed on May 2, 2012. Carolyn W. Colvin became the
Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule
25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin, or "the
Commissioner," is the Defendant in this suit.

substantial evidence in the record and is in accordance with the applicable legal standards. Therefore, this Court hereby grants the Commissioner's motion for judgment on the pleadings and denies the Plaintiff's motion.

## PROCEDURAL HISTORY

On December 22, 2008, Valerie Lea Davenport protectively filed an application for DIB and SSI, claiming that she was disabled beginning on January 1, 2008 after a bus's side mirror struck her on January 31, 2007, causing chronic back pain along with pre-existing obesity, asthma, and mental health issues. Administrative Transcript ("Tr.") at 151-156. Davenport's claim was denied on May 6, 2009. Tr. at 66. At her request, an administrative hearing was scheduled for June 3, 2010. Tr. at 109. Plaintiff, represented by attorney Gregory Fassler, testified at the hearing in Rochester, New York before Administrative Law Judge ("ALJ") James E. Dombeck. Tr. at 34-63.

On July 22, 2010, the ALJ issued a decision finding that Davenport was not disabled during the period from her alleged onset date. Tr. at 20-28. On March 9, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. at 1-7. This action was filed on May 2, 2012.

## FACTUAL BACKGROUND

At the time of the hearing, Plaintiff was a 38-year-old individual with a high school education and one year of college

completed.  Tr. at 39.  Her past relevant work was as a caterer. Tr. at 157.  Davenport claims she became disabled on January 1, 2008, due to "degenerative disc disease, a bulging disc, depression, obesity, and asthma resulting in continuous bouts of bronchitis and pneumonia." Tr. at 115.

The record also reveals that Davenport has a history of mental health issues.  She was treated at the Outpatient Clinic at the Orleans County Mental Health facility from April 1988 to July 1993, per an agreement with her probation officer.  Tr. at 222-241.  She presented with symptoms of Borderline Personality Disorder and a history of substance abuse problems.  Starting July 21, 1999, after Child Protective Services removed her two children, she was treated at the Mental Health Outpatient Clinic at the Evelyn Brandon Health Center.  Tr. at 242-247. She was diagnosed with adjustment disorder with anxious mood.  Her Global Assessment of Functioning ("GAF") score was 62.  In May 2000, she dropped out of the treatment program.

Records from Catherine Tan, M.D., dated May 24, 2006 to March 15, 2007, reveal Plaintiff was diagnosed with obesity and treated for chronic asthma and depressive disorder.  Tr. at 248-252.  She was approximately 5'3" tall and weighed 224 pounds.

On January 31, 2007, Davenport presented to the Emergency Department at Strong Memorial Hospital with complaints of diffuse pain after a bus mirror struck her and threw her on her back.  Tr.

at 254-257.  Computed tomography ("CT") scans of Davenport's chest, abdomen and pelvis showed "no fracture or solid organ injury." X-rays of her cervical spine, chest, and pelvis showed no abnormalities.  On February 5, 2007, CT scans showed no head injury or abnormalities, except a "benign-appearing cystic lesion in [a] vertebral body."  Tr. at 259-260. On February 13, 2007, follow-up x-rays were taken at the University of Rochester Medical Center's Department of Imaging Sciences, revealing no acute fracture, subluxation, or dislocation in the spine or pelvis.  Tr. at 253. There was no other medical evidence from 2007 in the record.

On September 24, 2008, Davenport first presented at Unity Family Medicine, located on Orchard Street, to establish care for her back and right hip pain.  Tr. at 398-401.  Plaintiff informed Susan Blake Lyons, the examining Physician Assistant ("PA"), that she was involved in litigation for injuries she sustained as a pedestrian struck by a school bus.  She did not have insurance, and she was unable to work as a waitress because employers did not want to hire her due to her physical limitations.  She complained that pain medications did not alleviate her condition, and she would occasionally lose feeling in her left leg and collapse.  She also complained of right hip pain, chronic asthma, insomnia, depression and possible bipolar disorder.  PA Lyons was unable to conduct a valid examination of Plaintiff's back and spine because Plaintiff "yelled in pain whether [Lyons] was touching her back or not.  She

-4-

made no attempt to flex/extend/rotate her lumbar spine during [the] exam.  However, [she] was able to do so when not being examined." Tr. at 400.  PA Lyons observed that Plaintiff was anxious and had a poor attention and concentration span.  She diagnosed Plaintiff with chronic asthma, depression not otherwise specified ("NOS"), Bipolar Disorder NOS, lower back pain, obesity, and acute insomnia and arranged follow-up treatment.

On October 13, 2008, Plaintiff complained of vomiting and sweating to Robin Baines, M.D., at Unity Family Medicine at Orchard Street.  Tr. at 396-397.  Dr. Baines observed no unusual anxiety or evidence of depression.

On November 19, 2008, Plaintiff returned to Unity Family Medicine at Orchard Street with complaints of back spasms.  Tr. at 394-395.  NP Berrios noted that despite reported muscle spasms and mild pain with motion, Davenport's extremities appeared normal, and she was alert and oriented.

On December 9, 2008, Plaintiff presented at the outpatient clinic at St. Mary's Hospital with complaints of a sore throat, body aches, and ear aches.  261-264. She was diagnosed with an Upper Respiratory Infection, bronchitis and an ear infection.  She had normal breathing and an appropriate, alert demeanor.  She smoked half a pack of cigarettes per day.

On January 2, 2009, Davenport attended a follow-up visit at Unity Family Medicine at Orchard Street.  Tr. at 392-393.  PA Lyons

re-filled Plaintiff's asthma medication, counseled her on weight loss and tobacco use, treated her acute ear infection, and administered a flu shot and pneumovax. Lyons also dispensed pain medication for Davenport's chronic lower back pain.

On January 20, 2009, Plaintiff was treated at the outpatient clinic at St. Mary's Hospital for back and wrist pain due to slipping and falling the day before. Tr. at 268-272. The attending physician diagnosed Plaintiff with a wrist contusion and back strain. She had a muscle spasm and limited range of motion in her lumbar spine region, decreased range of motion and pain in her right wrist, and full range of motion in the other upper and lower extremities.

On February 10, 2009, NP Berrios at Unity Family Medicine at Orchard Street treated Plaintiff for an acute ear infection, chronic allergies and asthma. Tr. at 389-391. After observing tenderness and mild to moderate pain in Plaintiff's lower back, which was aggravated by bending, lifting, and pushing, NP Berrios ordered a magnetic resonance imaging ("MRI") be taken of the lumbar spine for Plaintiff's history of lower back pain and right hip and leg pain. Tr. at 274, 386-387. Howard Silberstein, M.D., completed an MRI report dated February 23, 2009, finding that bone marrow signal and alignment were normal, and there were no other disc abnormalities apart from mild L5-S1 disk degeneration and mild

disk bulge on the right at the L5-S1 level with no obvious compressions of the spinal nerve.

On March 20, 2009, Dr. Silberstein examined Davenport, who claimed that only a hot tub alleviated the pain, and none of the pain medications she had tried improved her condition. Tr. at 311. Plaintiff was able to walk, though she reported walking made the pain worse, and she had full strength in all her extremities. Dr. Silberstein was unable to perform the straight leg test because Plaintiff complained that any movement of both legs exacerbated her lower back pain. Dr. Silberstein opined that the mild disk degeneration and herniation without obvious compression of the spinal nerve found in the MRI did not warrant intervention beyond conservative treatment.

On March 26, 2009, a chest x-ray from Strong Memorial Hospital showed clear lungs with no evidence of acute cardiopulmonary disease. Tr. at 278.

NP Berrios' records indicate that Plaintiff had an episode of seizure-like shaking on March 27, 2009. Tr. at 381. He opined that it was possibly related to her medications.

NP Berrios referred Plaintiff to Unity Health's Spine Center. Tr. at 368. On April 6, 2009, she presented to Mark Livecchi, M.D., at Unity Health's Spine Center. Tr. at 304-307. She complained that her back pain had worsened since the bus accident and was radiating into her right and left legs. Dr. Livecchi

observed that the spine showed some posterior tenderness, normal flexion and extension. He opined that Plaintiff's decreased strength in her L5/S1 myotomes was consistent with the MRI from February 2009 showing a herniated L5 disc. Dr. Livecchi recommended that she return for a consultation with the Neurosurgery clinic to see if surgery was required. Plaintiff smoked a pack of cigarettes per day.

Dr. Silberstein, the attending neurosurgeon at Strong Memorial Hospital, examined Plaintiff for a follow-up consultation on April 10, 2009. Tr. at 309-310. Dr. Silberstein found that Plaintiff's complaints of numbness in the right leg were inconsistent with her response to pinprick stimulation throughout the physical examination. He again reviewed the MRI from February 2009, and recommended conservative treatment rather than surgical intervention.

On March 25, 2009, Plaintiff presented to Unity Family Medicine at Orchard Street with complaints of back pain and a rash on her abdomen. Tr. at 383-385. NP Berrios observed tenderness in the lumbar spine and reduced range of motion due to pain. Davenport was tolerating her medication well for her chronic asthma and depression. NP Berrios observed no unusual anxiety or evidence of depression. He referred Plaintiff to the Unity Spine Center for evaluation and treatment for her back pain.

April 9 and 28, 2009, Davenport returned to Unity Family Medicine at Orchard Street for follow-up visits. Tr. at 377-380. She had tenderness and reduced range of motion in all directions in the lumbar spine. NP Berrios prescribed Vicodin for pain management.

On April 21, 2009, Harbinder Toor, M.D., administered an Orthopedic Consultative Examination. Tr. at 325-329. Plaintiff complained of constant and sharp pain in the lower back, which she evaluated to be a 10 out of 10 on the scale of 1 to 10. She complained that the pain radiated to the right leg more than the left. She also felt tingling and numbness in the right foot and would lose balance occasionally. Davenport declined to walk on heels and toes, squat, or lie down on the examination table; however, she needed no help changing for the exam. Dr. Toor observed no tenderness or spasm in the thoracic and lumbar spines, though Plaintiff declined forward flexion and extension tests due to pain. In a medical source statement, Dr. Toor opined that Plaintiff "[had] moderate to severe limitations standing, walking, squatting, bending, or heavy lifting. Twisting of the spine [was] also difficult due to back pain. She [had] a moderate limitation sitting a long time. Her balancing problem due to limping also interfere[d] with her daily routine and walking and standing a long time." Tr. at 327.

On April 21 2009, Christine Ransom, Ph.D., completed a Psychiatric Consultative Examination Report.  Tr. at 330-333.  She observed that Plaintiff's attention and concentration were mildly to moderately impaired, limited by depression.  She reported that Plaintiff rode the bus to the evaluation, could participate in activities of daily living, such as dressing, bathing, and grooming herself, cooking, cleaning, doing laundry, shopping, managing money, and socializing with friends.  In a medical source statement, Dr. Ransom opined that Davenport could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for tasks, maintain a regular schedule and learn simple tasks, but would have difficulty performing complex tasks independently.  Also, Dr. Ransom noted she would have moderate difficulty dealing with stress.  Plaintiff's prognosis was fair to good with more intensive treatment for her moderate major depressive disorder.

On April 29, 2009, Disability Analyst B. Randall assessed Plaintiff's physical residual functional capacity, and found that her allegations of symptoms were not fully credible because she declined to participate fully in her examinations, required no surgeries and did not participate in physical therapies.  Tr. at 334-339.

On April 30, 2009, non-examining state agency psychological consultant, M. Morog, Ph.D., completed a Psychiatric Review and

Mental RFC Assessment. Tr. at 340-357. Dr. Morog found evidence supporting mild restriction of daily activities; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; with no repeated episodes of deterioration lasting for an extended duration. Dr. Morog opined that Plaintiff's major depressive disorder did not prevent her from performing simple work. Plaintiff could maintain a schedule, attention and concentration; related to others; but possibly had a problem dealing with stress.

On June 16, 2009, Davenport returned for a follow-up visit to Unity Family Medicine at Orchard Street. Tr. at 372-376. Plaintiff presented with chronic asthma, back pain, seasonal allergies, and depression. She was classified as morbidly obese, weighing 245.5 pounds.

On August 3, 2009, NP Berrios completed a medical source statement for the Monroe County Department of Human Services. Tr. at 416-419. He reported that Plaintiff could not use public transportation. He also reported that Plaintiff experienced drowsiness as a side effect of her medication. NP Berrios opined that Davenport's abilities to walk, stand, sit, push, pull, bend, and lift or carry would each be limited to one-to-two hours in an eight-hour workday. He opined that she would have a fair prognosis with back surgery, but without surgery, her lower back pain at the time of the evaluation rendered her unable to participate in

activities, other than treatment and rehabilitation, for a period of 12 months.

On November 13, 2009, Paul Maurer, M.D., examined Davenport at University of Rochester Medical Center's Department of Neurosurgery. Tr. at 425-426. Dr. Maurer observed normal hip range of motion, no consistent loss of strength, and a sensory exam within normal limits to touch and position. He opined that Plaintiff's "moderate degenerative change at L5-S1 [was] typical even at [her] young age," and there was "no focal structural process which could account for her anatomic symptoms in such a manner" that would require medical intervention beyond conservative measures.

On November 23, 2009, Davenport reported at Rochester General Hospital with shortness of breath at rest. Tr. at 428-444. The attending physician noted no back pain, no evidence of focal tenderness or deformity, and full range of motion with no evidence of weakness in the extremities. Plaintiff appeared awake and alert, with behavior, mood, and affect within normal limits. She was diagnosed with suspected minimal bibasilar atelectasis (failure to breathe deeply for various reasons) or pneumonia.

On December 16, 2009, NP Berrios referred Plaintiff to a nutritionist at Unity's Weight Management Center to treat Plaintiff's morbid obesity, but Plaintiff chose not to visit this facility. Tr. at 454-455. He also referred her to the Pieters

Family Life Physical Therapy & Rehabilitation facility to evaluate Davenport's disc degeneration.

On May 10, 2010, NP Berrios examined Davenport.  Tr. at 420-421, 445-449, 460-464.  She weighed 259 pounds.  NP Berrios counseled her on initiating a walking program and diet plan.  He referred her to Clifford Ameduri, M.D., for evaluation and treatment of her Disc Degeneration NOS DDD.

At a follow-up visit to the Orchard Street Community Health Center on April 12, 2010, Dr. Baines noted that Dr. Livecchi at the Spine Center did not recommend any therapy or injections.  Tr. at 465-467.  Dr. Baines observed that Plaintiff was alert and oriented with no unusual anxiety or evidence of depression.

At the hearing before the ALJ on June 3, 2010, Plaintiff testified about her physical and mental impairments, medical treatment, and activities of daily living. Tr. at 34-63.  Plaintiff stated that she weighed 200 pounds at the time of the accident with the bus mirror, and her medications caused her to gain weight.  She was 264 pounds at the time of the hearing.  She stated that none of her physicians had discussed any treatments for weight loss or breast reduction to alleviate her back pain.  She stated that she couldn't wash her floors or bathe herself.  She lived with her father, son, and daughter.

She would play on her computer, watch television, or read all day, after getting up and doing what she could around the house.

She had a back brace at the hearing that Luis Berrios[2] gave to her, and said her back hurt if she sat or stood for longer than 15 to 20 minutes. Later in the testimony, she said she could only play video games for 10 to 20 minutes at most. She had a hard time walking and would occasionally lose the feeling in her right leg and fall. She complained of feeling physically uncomfortable, and said her medications made her groggy, tired, dizzy, and nauseous. Her asthma medication, she testified, was working despite occasional attacks.

At three appointments in June 2010, NP Berrios treated Davenport at the Orchard Street Community Health Center, noting tenderness in the lumbar spine, and moderate pain with motion. Tr. at 486-498. He diagnosed her with low back pain with radiation, disc degeneration, and tobacco abuse. He referred her to the Pieters Family Life Physical Therapy & Rehabilitation facility for aqua therapy. NP Berrios also signed an undated application for Plaintiff to obtain a parking permit for her lumbar disc disease. Tr. at 519.

On June 15, 2010, Clifford Ameduri, M.D, examined Davenport. Tr. at 530-537. Plaintiff denied that the pain radiating down both her legs caused buckling, falling, or giving way. Dr. Ameduri noted that Plaintiff could cook, dress, groom, and bathe

---

[2] Luis Berrios, NP, is referred to as "Dr. Burroughs" throughout Plaintiff's testimony in the hearing transcript. See Tr. at 37-60.

independently. She did not drive. She could sit and stand. Dr. Ameduri noted that Plaintiff had difficulty coming to full extension when testing her spine, but he did not know if she was using maximum volitional effort. He also noted that Plaintiff has allodynia (pain due to a stimulus which does not normally provoke pain), and he believed her complaints of severe pain from L1-S1 in the deep paraspinal with very light stroking was a non-clinical response, so could not be medically observed. He opined that she was capable of participating in aquatic physical therapy.

On July 27, 2010, after the ALJ issued his decision, Davenport returned to Dr. Ameduri with complaints of back pain that radiated and that she had trouble tolerating the recommended aquatic physical therapy. Tr. at 536-537. Dr. Ameduri stated the purpose for his evaluation was to determine whether Plaintiff's pain radiated. After reviewing more medical records and examining her, he observed that Plaintiff had clear lungs. She had some trouble standing up and decreased range of motion in the lumbar spine, but he did not believe she was using maximal volitional effort. Her straight leg raise was positive on the right and negative on the left, and she exhibited allodynia with light stroking throughout the lumbosacral area. He thus found that the Electromyography[3] was benign, and the MRI displayed no information that would explain why

_____

[3] Electromyography ("EMG") is a technique for evaluating and recording the electrical activity produced by skeletal muscles.

she was having such severe pain.  He opined that she continue with aquatic physical therapy and her prescribed medications.

On December 2, 2010, Plaintiff presented at the Mental Health Outpatient Clinic at Unity Hospital's Evelyn Brandon Health Center, per Dr. Baines' referral. Tr. at 522-529.  Davenport complained that she was sad that she could not work anymore and had depression due to her physical conditions.  Emily Rein, Mental Health Counselor ("MHC"), examined Plaintiff, observing that "she [was] not interested in engaging in mental health treatment, although certainly seem[ed] motivated for secondary gains of medication and disability."  Tr. at 529.  MHC Rein diagnosed recurrent major depressive disorder of moderate severity; personality disorder, NOS; and possible learning disorder, NOS.

**DISCUSSION**

**I. Scope of Review**

When reviewing the appeal of the Social Security Administration's denial of a claimant's application for benefits, Title 42 U.S.C., Section 405(g) directs the Court to accept the Commissioner's factual findings, provided that such findings are supported by substantial evidence in the record.  Substantial evidence is defined as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938).  The Court's scope of review is limited to determining whether the Commissioner's findings were supported by substantial evidence in

the record, and whether the Commissioner employed the proper legal standards in evaluating the plaintiff's claim. Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983).

Judgment on the pleadings pursuant to Rule 12(c) may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the content of the pleadings. Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639 (2d Cir. 1988). If, after reviewing the record, the Court is convinced that Plaintiff has not set forth a plausible claim for relief, judgment on the pleadings may be appropriate. See generally Bell Atlantic Corp. V. Twombly, 550 U.S. 544 (2007).

## II.  The Commissioner's Decision to Deny the Plaintiff benefits is Supported by Substantial Evidence in the Record

An individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1383(a)(3)(B). Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). In his decision denying benefits, the ALJ adhered to the five-step analysis required to evaluate disability claims.[4]  Tr. at 24-31.

---

[4]

Under step 1 of the process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability. Tr. at 22. At steps 2 and 3, the ALJ concluded that Plaintiff had the following "'severe' impairments, insofar as that term is interpreted to mean having some, albeit minimal, effect on functioning: back pain, asthma, obesity, and depression." Tr. at 23. The ALJ found, however, that Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in Appendix 1, Subpart P of the Social Security Administration's regulations. Tr. at 24.

At steps 4 and 5, the ALJ concluded that although Plaintiff was unable to perform her past relevant work, she retained the residual functional capacity ("RFC") to perform light work with certain restrictions. Tr. at 25-27. Considering her age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. Tr. at 27.

---

The five-step analysis requires the ALJ to consider the following: (1) whether the claimant is performing substantial gainful activity; (2) if not, whether the claimant has a severe impairment which significantly limits his or her physical or mental ability to do basic work activities; (3) if the claimant suffers severe impairment(s), the ALJ considers whether the claimant has impairment(s) that lasted or expected to last for a continuous period of at least twelve months, and impairment(s) meets or medically equals a listed impairment in Appendix 1, Subpart P, Regulation No. 4; if so, the claimant is presumed disabled; (4) if not, the ALJ considers whether impairment(s) prevents the claimant from doing past relevant work; (5) if the claimant's impairment(s) prevents him or her from doing past relevant work, if other work exists in significant numbers in the national economy that accommodates the claimant's residual functional capacity and vocational factors, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

Davenport argues that the ALJ's decision finding that she is not disabled was against the weight of substantial evidence and erroneous as a matter of law. Specifically, Plaintiff maintains that the ALJ's RFC finding was not supported by substantial evidence; the ALJ's assessment of Plaintiff's credibility was not supported by substantial evidence; and the ALJ should have consulted a Vocational Expert. <u>See</u> Plaintiff's Memorandum of Law ("Pl's Mem."), Points 1-3 (Dkt. No. 14).

## A. The ALJ's Residual Functional Capacity Finding is Supported by Substantial Evidence in the Record

In order to make a proper disability finding, the ALJ must consider all of the relevant medical and other evidence in the case record to assess the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.4545(a)(3)-(4); <u>see</u> <u>also</u> SSR 96-8p, SSR LEXIS 5, 1996 WL 374184 (S.S.A. July 2, 1996). Here, the ALJ found that Plaintiff retained the RFC to perform light work[5] "except that she is limited to simple, entry level work." Tr. at 25.

With regard to Plaintiff's physical impairments, particularly the severity of her lower back pain, the ALJ properly afforded

---

[5]

The regulations define light work as a job "which involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). A job is also categorized as "light work" if it "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." <u>Id.</u>

controlling weight to the opinions of examining medical specialists and consultants, Drs. Maurer, Silberstein and Livecchi. Tr. at 25-27. The ALJ found that the opinion evidence from Luis Berrios, NP, the only treating source supporting disability, and the opinion of consultative examiner, Dr. Toor, were unsupported by the medical evidence in the record. Id.

Plaintiff argues that the ALJ erred in failing to afford significant weight to the opinions of treating NP Berrios, and consultative examiner Dr. Toor, instead substituting his own lay interpretation of the medical data. See Pl's Mem. at 11-15. However, I find that the ALJ thoroughly and properly explained his rationale in affording less weight to these two sources.

With regard to NP Berrios, "the ALJ [is] free to discount [an NP's] assessments accordingly in favor of the objective findings of other medical doctors." Genier v. Astrue, 298 F. App'x. 105, 108/109 (2d Cir. 2008).

The Social Security regulations provide that NP's are considered "other medical sources," rather than "acceptable medical sources," such as licensed physicians. See 20 C.F.R. § 416.913(a),(d)(1). Because NP Berrios is not an "acceptable medical source," his "opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." Genier, 298 F. App'x. at 108; 20 C.F.R. §§ 404.1513(d)(1); 416.913(d)(1). A treating source's opinion will be given controlling weight when it is "well

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." See 20 C.F.R. § 404.1527(c)(2). The Court has consistently found:

> In determining the weight to be given to the opinions from both "acceptable medical sources" and "other medical sources," the ALJ must consider the following six factors: "the length and frequency of the treating relationship; the nature and extent of the relationship; the amount of evidence the [source] presents to support his or her opinion; the consistency of the opinion with the record; the [source's] area of specialization; and any other factors the claimant brings to the ALJ." Carlantone v. Astrue, No. 08 Civ. 07393(SHS), 2009 U.S. Dist. LEXIS 60477, 2009 WL 2043888, at *5 (S.D.N.Y. 2009); See 20 C.F.R. § 416.927(d); SSR 06-03p, 2006 SSR LEXIS 5. After weighing the factors, "[t]he ALJ is free to conclude that the opinion of an ["other medical source"] is not entitled to any weight, however, the ALJ must explain that decision." Saxon v. Astrue, 781 F. Supp. 2d 92, 104 (N.D.N.Y. 2011).

Drennen v. Astrue, 2012 U.S. Dist. LEXIS 2362, 7-8 (W.D.N.Y. Jan. 9, 2012)

The ALJ also found that NP Berrios' employability assessment was contradicted by his own treatment record. Tr. at 26. In the medical source statement completed by NP Berrios in August 2009, he described the Plaintiff as "very limited" in all categories of functioning, including her abilities to walk, stand, and sit. Tr. at 416-419. However, when NP Berrios examined Davenport in May 2010, he suggested she participate in a walking program to lose weight. Tr. at 420-421, 445-449, 460-464.

In November 2009, Dr. Maurer opined that Plaintiff's "moderate degenerative change at L5-S1 [was] typical even at [her]

young age," and there was "no focal structural process which could account for her anatomic symptoms in such a manner" that would require medical intervention beyond conservative measures. Tr. at 425-426. Dr. Silberstein examined Plaintiff on a few occasions, observing that she could walk, despite alleged pain. Tr. at 311. He opined that her disk degeneration and herniation were mild and did not warrant intervention beyond conservative treatment. Dr. Livecchi at the Spine Center examined Plaintiff and did not recommend physical therapy or injections. Tr. at 465-467.

Plaintiff relies upon Dr. Toor's opinion, as an "acceptable medical source," that Plaintiff had "moderate to severe limitations standing, walking, squatting, bending, and heavy lifting; with a balancing problem due to limping that interfered with an ability to walk or stand for a long time." However, the ALJ assigned no significant weight to this report, explaining it was inconsistent with the findings of three consulting physicians above and the complete record, including Plaintiff's testimony. It is within the ALJ's province to weigh conflicting evidence in the record and credit that which is more persuasive and consistent with the record as a whole. See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve." (Citing Richardson v. Perales, 402 U.S. 389, 399 (1971))).

With regard to Plaintiff's mental impairments, the ALJ relied on opinions from non-examining state agency psychological

consultant, M. Morog, Ph.D., and examining psychiatric consultant, Christine Ransom, Ph.D., both of whom addressed the Plaintiff's symptoms and functional limitations. Tr. at 25-27. Evidence that Plaintiff had only slight mental limitations supported the ALJ's finding that she was limited to performing simple, entry level work. In April 2009, Dr. Morog opined that Plaintiff's major depressive disorder did not prevent her from maintaining a schedule, attention and concentration. Tr. at 340-357. Dr. Ransom reported that Plaintiff rode the bus to the evaluation, could participate in activities of daily living, such as dressing, bathing, and grooming herself, cooking, cleaning, doing laundry, shopping, managing money, and socializing with friends. Tr. at 330-333.

Plaintiff argues that the ALJ erred by stating that the only mental health evaluation in the record was the consultative psychiatric examination. Pl's Mem. at 17. In support of this argument, Plaintiff cites a psychiatric evaluation at the Evelyn Brandon Medical Center that occurred on December 2, 2010, more than four months after the ALJ issued his decision. Tr. at 522-529.

Thus, the arguments set forth at point 1 of Plaintiff's memorandum of law in support of his motion are rejected.

**B. The ALJ Properly Assessed Plaintiff's Credibility**

The ALJ found that Davenport's statements concerning the intensity, persistence and limiting effects of her symptoms were

not credible to the extent that they were not supported by the objective medical record, and were inconsistent with the RFC assessment.  Tr. at 26.  The ALJ "has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment...[which he must do] in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (citation omitted).  The ALJ thus is not obligated to accept a claimant's testimony about his limitations without question. Id.

Plaintiff contends that the ALJ's credibility finding was improper because the ALJ found that the statements inconsistent with his own RFC determination.  Pl's Rep. Mem. at 17-18. However, this Court finds that the ALJ's credibility assessment was proper and consistent with the record as a whole.

Here, the ALJ explicitly stated that he reviewed all of Plaintiff's subjective complaints.  Tr. at 26.  He properly considered Plaintiff's activities of daily living, inconsistent testimony, and the discrepancy between her alleged symptoms and the medical evidence in the record.  Tr. at 29.

In particular, the ALJ noted that Plaintiff testified to spending all day playing computer games and watching television, as well as reading, and later stated that she could only engage in those activities for 10 to 20 minutes at most.  Tr. at 26. She stated that her father, daughter, and boyfriend assisted her in

most activities of daily living. Tr. at 34-63. She also arrived at the hearing with a back brace that she wore all day, three to four days per week. Tr. at 51. However, there is no medical evidence in the record to support this testimony.

Accordingly, Plaintiff's argument that the ALJ failed to properly assess his subjective complaints is rejected. See Cruz v. Astrue, No. 12-0953, 2013 WL 1749364, *14 (S.D.N.Y. Apr. 24, 2013)(credibility analysis is complete where the ALJ found that claimant's alleged symptoms were "inconsistent with the above residual functional capacity," and where ALJ provided a basis for this finding by discussing the claimant's complaints in the context of the complete medical record).

## C. The Commissioner Did Not Err in Failing to Consult a Vocational Expert

Plaintiff argues that the ALJ failed in not obtaining testimony from a vocational expert regarding Plaintiff's nonexertional limitations. Pl's Mem. at 20-21. Therefore, she argues that it was improper for the ALJ to use the Medical-Vocational guidelines in determining whether there was work that Davenport could perform in the national economy. Id.

The ALJ found that Plaintiff retained the RFC to perform the full range of light work, but also was limited to simple, entry-level work. Tr. at 25-27. Generally, the Court will find that the testimony of a vocational expert is only necessary when the claimant's nonexertional impairments significantly diminish her

ability to work.  See Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986).  Here, the ALJ found that Plaintiff's additional mild mental limitations, or nonexertional limitations, had little or no effect on the occupational base of unskilled light work.  Tr. at 28.

The regulations provide that the ALJ will rely on his RFC finding and information regarding Plaintiff's vocational background when applying the guidelines.  §§ 404.1545(a)(5)(ii), 416.945(a)(5)(ii).  Because the ALJ had found that the Plaintiff's RFC to perform a wide range of light work was not significantly limited by her nonexertional limitations, and because this Court finds the ALJ's RFC assessment to be sufficient and proper, the ALJ did not err in applying the Medical-Vocational Guidelines set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2.

### CONCLUSION

Upon review of the entire record, this Court finds that the Commissioner's denial of SSI and DIB was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the Court grants the Commissioner's motion for judgment on the pleadings (Dkt. No. 11). Plaintiff's motion for judgment on the pleadings is denied (Dkt. No. 14), and Plaintiff's complaint (Dkt. No. 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

**S/Michael A. Telesca**

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    July 15, 2013
          Rochester, New York